IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-30067 |
| | ) | |
| TODD SHEFFLER, | ) | |
| WILLIE HEDDEN, and | ) | |
| ALEX BANTA, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**SUE E. MYERSCOUGH, United States District Judge:**

Pending is Defendant Alex Banta's and Todd Sheffler's Motion in Limine No. 5-1 [d/e 142] relating to certain opinions of Government medical expert Dr. Patrick Collier. A <u>Daubert</u> hearing on the motion was held on July 15, 2021.

## BACKGROUND

Defendants Sheffler and Banta are both charged with conspiracy to deprive civil rights (Count 1); deprivation of civil rights (Count 2); and conspiracy to engage in misleading conduct (Count 3).

1

Defendant Sheffler is charged with obstruction—falsification of a document (Count 4) and obstruction—misleading conduct (Count 5).

Defendant Banta is charged with obstruction—falsification of document (Count 9) and obstruction—misleading conduct (Count 10).

The charges in the Indictment relate to events that occurred at the Western Illinois Correctional Center in Brown County, Illinois, on or about May 17, 2018, including an alleged assault of inmate Larry Earvin, which resulted in serious internal injuries and the death of Mr. Earvin.

The Defendants' motion in limine under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) concerns the admissibility of certain opinions that Government expert, Patrick Collier, M.D., is expected to give at trial. Defendants requested a Daubert hearing on the following issues: (1) whether Dr. Collier is qualified to provide an opinion regarding whether Mr. Earvin suffered from a concussion; (2) whether Dr. Collier is qualified to provide an opinion as to whether Mr. Earvin suffered a traumatic brain injury; and (3) whether Dr.

Collier is qualified to provide an opinion that he agrees with forensic pathologist Dr. Gershom Norfleet's opinion on the cause of Mr. Earvin's death.

## DR. COLLIER'S TESTIMONY

Dr. Collier is a trauma surgeon who was working at St. John's Hospital, Springfield, Illinois, on May 17, 2018, when Mr. Earvin was transferred from Sarah D. Culbertson Memorial Hospital in Rushville, Illinois.  Dr. Collier was one of the physicians who treated Mr. Earvin from May 17 to June 18, 2018, when Dr. Collier ordered Earvin's discharge.

Dr. Collier testified regarding his educational background and his work history as a physician.  He is board certified in General Surgery and Surgical Critical Care.  As a trauma surgeon, Dr. Collier has had contact with over 1,000 patients and has performed surgeries on dozens of patients.  He discussed his role in treating Mr. Earvin as well as the roles of other physicians with whom he worked, such as anesthesiologists and radiologists.

When Mr. Earvin arrived at St. John's, he was unresponsive. Dr. Collier determined that he had suffered trauma and had a

number of medical issues requiring attention. These included a collapsed lung, internal bleeding, and multiple fractures on the right side of his ribs. Dr. Collier testified Mr. Earvin's injuries upon arriving were life threatening because of the amount of bleeding. Mr. Earvin was taken to the operating room for exploratory surgery. Dr. Collier performed an ileostomy and removed part of Earvin's colon. Mr. Earvin was then moved to the intensive care unit. Dr. Collier did not have contact with Mr. Earvin in the days immediately thereafter. He resumed care a couple of weeks later as Mr. Earvin's daytime treating physician.

Dr. Collier also testified that Mr. Earvin had head trauma and abrasions to his face. A CT scan was performed that did not show trauma to the brain in terms of bleeding. Dr. Collier testified that CT scans do not always reveal traumatic brain injury, which can range from very mild to very severe with a large amount of bleeding. He testified CT scans are not particularly useful for injuries that are "more subtle," such as a shear injury which is a traumatic brain injury. A shear injury or diffuse axle injury is caused by actual shearing of some of the cells of the brain. A negative CT scan does

not rule out a mild traumatic brain injury. Dr. Collier testified that an MRI scan is a better technique for determining if a traumatic brain injury exists.

Dr. Collier testified Mr. Earvin generally continued to be non-responsive in the weeks after his surgery and was never more than "minimally responsive." Following the surgery, another doctor ordered an MRI of Mr. Earvin's brain. Dr. Collier testified that the radiologist observed some tiny spots on the brain. It is unclear whether they are from a shear injury or tiny infarcts, which is a disruption of the blood supply from any number of causes—such as a stroke or some preexisting condition. Dr. Collier testified that the MRI results were "ultimately inconclusive when taken in a vacuum."

Dr. Collier testified Dr. Elmore, a neurologist, determined on May 25, 2018 that the imaging was consistent with a traumatic brain injury. Dr. Collier testified he resumed care of Mr. Earvin five or six days before his discharge. He observed Mr. Earvin followed commands intermittently. Mr. Earvin was awake but not fully interactive. He responded to questions or commands to a minimal degree. Dr. Collier testified that he based his conclusion that Mr.

Earvin suffered from some type of mild shear injury or traumatic brain injury on Earvin's medical records, the results of the MRI, and his own observations. The radiologist's conclusions are consistent with Dr. Collier's opinion.

Dr. Collier testified a concussion generally is a brain injury based on a clinical finding that is not identifiable on imaging studies. A shear injury might show up on imaging whereas a concussion would not. He testified that an individual with a mild traumatic brain injury and a concussion might have a normal MRI or CT scan.

Exhibit 2 includes Dr. Collier's discharge summary and states in part, "MRI of the brain was consistent with some shear injury accounting for his altered mental status not explained by a negative CT." When Dr. Collier wrote his discharge summary, he was aware of Mr. Earvin's medical records and the findings by other physicians. Dr. Collier knew Mr. Earvin had "ongoing altered mental status" which was consistent with at least a mild form of traumatic brain injury that could explain those findings.

When Dr. Collier ordered Mr. Earvin discharged, he was transferred to a prison medical center. Dr. Collier testified that at

the time of the discharge, Mr. Earvin had a risk of deterioration from a number of factors. His life was likely going to be forever altered given that he had an ileostomy, a tracheostomy, and he was being fed through a tube down his nose. He was also very weak and unable to get out of bed and move about on his own. There was going to be a lengthy period of rehabilitation presumably lasting several months to several years. He was also at risk for developing any number of complications or infections after discharge.

Mr. Earvin later returned to St. John's Hospital, though Dr. Collier did not treat him. Dr. Collier eventually learned of Mr. Earvin's death.

Dr. Norfleet performed the autopsy on Mr. Earvin, identified the injuries he sustained and concluded that his death was caused by complications of blunt thoracoabdominal trauma, as reflected in the Autopsy Report which was admitted as Exhibit 5. Based on his treatment and observations of Mr. Earvin, Dr. Collier agreed with Dr. Norfleet's conclusion about the cause of death. Dr. Collier testified that, were it not for the medical intervention performed upon Mr. Earvin's arrival at St. John's, he would have died within 24 hours.

The cause of death as determined by Dr. Norfleet was from the trauma that Dr. Collier treated.

Dr. Norfleet's report showed that he did a microscopic examination of the brain and stated that sections of the brain are "histologically unremarkable." Dr. Collier stated that is basically a confirmation there was no brain bleed. There are no findings in the autopsy report that Mr. Earvin suffered a brain bleed. The report also does not document a mild finding of traumatic brain injury. Dr. Collier testified he did not believe that finding to be significant and it does not change his opinion. There is going to be some degree of healing after one month. Moreover, small sections of the brain were being examined. Dr. Collier testified "histologically unremarkable" does not imply no abnormality in any of the cells. He further testified the autopsy report does not contradict the findings of the MRI.

## **DISCUSSION**

In <u>Daubert</u>, the Supreme Court interpreted an earlier version of Rule 702 and explained that it imposes a special gatekeeping obligation on trial judges with regard to scientific testimony. While the scientific evidence need not have general acceptance, the district

court must ensure that the evidence is relevant and reliable before admitting it.  See Daubert, 509 U.S. at 588-89.

Federal Rule of Evidence 702 provides that judges act with a gatekeeping role "to ensure that expert testimony is both relevant and reliable." United States v. Truitt, 938 F.3d 885, 889 (7th Cir. 2019).  The Court must determine if the proposed expert is qualified, whether his methodology is scientifically reliable, and whether the testimony "will help the trier of fact to understand the evidence or determine a fact in issue." Id.; Fed. R. Evid. 702.

The fact that a doctor has a "medical degree does not make him qualified to opine on all medical subjects." Gayton v. McCoy, 593 F.3d 610, 617 (7th Cir. 2010).  However, "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats.  Id.; see also Doe v. Cutter Biological, Inc., 971 F.2d 375, 385 (9th Cir. 1992) ("The fact that the experts were not licensed hematologists does not mean that they were testifying beyond their area of expertise.  Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.")

Expert testimony from a medical doctor may be based on his medical experience and review of medical records and an autopsy report.  See Hall v. Flannery, 840 F.3d 922, 928 (7th Cir. 2016) ("Dr. Ruge arrived at his conclusions based on his review of the autopsy report; Weekley's medical records, including the MRI and CT scans taken before surgery; Dr. Flannery's operative report, and Dr. Flannery and Dr. Sampath's post-surgery progress notes; and deposition testimony;" he also "relied on his medical experience."); McCoy, 593 F.3d at 619 (when exact cause of death cannot be determined, "the jury should hear testimony, backed by accepted medical science, about factors that could have exacerbated her heart condition").

To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Rule 702 requires a flexible inquiry and recognizes that the accuracy of proposed expert testimony can be explored adequately via the normal adversarial process of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof." Lees v. Carthage College, 714 F.3d 516, 526 (7th Cir. 2013) (quoting Daubert, 509 U.S. at 596). "The party that proffers an expert's testimony must establish the admissibility of the testimony by a preponderance of evidence." Estate of Carlock v. Williamson, 2012 WL 75765, at *2 (C.D. Ill. Jan. 10, 2012) (citing Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009)).

**Opinion Regarding Concussion Or Traumatic Brain Injury**

The Defendants claim the record shows an absence of clinical symptoms that would be consistent with a concussion and, further, the word "concussion" does not appear in any disclosed medical records. Additionally, the Government has acknowledged there is no medical evidence that Mr. Earvin had a brain bleed. The Defendants further contend the medical records provide no support that Mr. Earvin had a traumatic brain injury.

Upon considering Dr. Collier's testimony, the exhibits, and the applicable law, the Court concludes Dr. Collier is qualified to provide an opinion that Mr. Earvin suffered from a type of traumatic brain injury such as a shear injury, concussion, or related injury. Dr. Collier testified his opinion is based on the MRI results, Mr. Earvin's medical records, and his treatment, and personal observations of

Mr. Earvin along with Dr. Collier's experience as a medical doctor and trauma surgeon.

Dr. Collier's opinion is scientifically reliable given that it is well accepted within the medical field that "it is not unusual for the CT scan to be entirely normal in a patient with TBI. In fact, the CT scan is typically normal in patients with milder TBI including concussion." www.asnr.org/patientinfo/conditions/tbi.shtml (American Society of Neuroradiology). Moreover, "even [an] MRI may not be able to detect any abnormality in a patient with TBI." *Id.* The Court concludes that Dr. Collier is qualified to give this testimony and his methodology is scientifically reliable. Pursuant to Rule 702, moreover, the testimony potentially "will help the trier of fact to understand the evidence or determine a fact in issue." The Defendants' objections go to the weight, not admissibility of the testimony, or to Dr. Collier's qualifications, or to the reliability or relevance of the testimony. The testimony may be challenged by cross-examination and/or the presentation of contrary evidence.

Accordingly, the Court has no basis to exclude Dr. Collier's testimony that Mr. Earvin suffered from a type of traumatic brain injury, such as shear injury, concussion or related injury.

**Opinion As To Cause Of Death**

Dr. Norfleet will testify that the cause of Mr. Earvin's death was due to complications of blunt thoracoabdominal trauma. Dr. Collier is expected to testify that Mr. Earvin would have died without the medical intervention and treatment immediately following the alleged assault on May 17, 2018, and he agrees with Dr. Norfleet's opinion regarding the cause of death. The Defendants claim that the Government only recently disclosed that Dr. Collier would be giving cause of death testimony. Accordingly, Defendants requested a Daubert hearing for the purpose of determining if Dr. Collier has a valid basis for giving that opinion.

The Government notes that Defendants do not object to Dr. Norfleet's testimony regarding cause of death. There is no rule precluding a physician from adopting the cause of death of another physician. "To the extent that this amounts to 'adopting the cause of death' finding of another expert, we see no problem with it." See Gayton, 593 F.3d at 618 ("In terms of his methodology, Dr. Weinstein, like Dr. Moulton, had to arrive at his conclusions based solely on an examination of a cold record, consisting of Taylor's

autopsy report, her medical records, and the testimony of the prison guards and other witnesses.").

Based on the foregoing, the Court concludes Dr. Collier's opinion and agreement with Dr. Norfleet is admissible under Rule 702 in that it potentially "will help the trier of fact to understand the evidence or determine a fact in issue." As with the testimony regarding a traumatic brain injury or concussion, this testimony can be challenged via cross-examination or presentation of contrary evidence. The Court has no basis to exclude Dr. Collier's testimony that Mr. Earvin would have died without the medical intervention and treatment immediately following the alleged assault and that he agrees with Dr. Norfleet's opinion as to cause of death.

## **CONCLUSION**

Based on the foregoing, the Court concludes that Dr. Collier's opinions are reliable and admissible under <u>Daubert</u> and applicable law.

For the foregoing reasons, the Defendants' Motion in Limine No. 5-1 [d/e 142] is GRANTED to the extent that Defendants seek a

Daubert hearing regarding the admissibility of certain opinions of Dr. Patrick Collier.

The Motion is DENIED to the extent that Defendants seek exclusion of those opinions.

ENTER: July 23, 2021

FOR THE COURT:

/s/ *Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT COURT