E-FILED
Thursday, 23 June, 2022  02:44:55 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-30067** |
| | ) | |
| **TODD SHEFFLER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, United States District Judge:**

Before the Court is the Government's Motion to Revoke Defendant Todd Sheffler's Proffer Agreement and to Allow Admission of Post-Proffer Statements in the Government's Case-In-Chief at Trial [Doc. 299]. The Motion was extensively briefed [Docs. 304, 306, 308, 309, 321, 322] and the Court held a Hearing on the Motion on June 14 and 15, 2022.

## I. BACKGROUND

On December 5, 2019, Defendants Todd Sheffler, Willie Hedden and Alex Banta were charged in a ten-count Indictment with conspiracy to deprive civil rights, conspiracy to engage in misleading

conduct, obstruction—falsification of document, and obstruction—
misleading conduct.  Doc. 1.  Defendant Hedden pleaded guilty to
certain charges and testified at the trial of Defendants Sheffler and
Banta.  On April 25, 2022, a jury convicted Banta on all charges but
was unable to reach unanimous verdicts as to Sheffler.  The retrial
of Defendant Sheffler is scheduled to begin on July 5, 2022.

Evidence Presented on Assault of Larry Earvin

The Government states that the evidence presented at trial
(which included Defendant Hedden's testimony) established that as
part of a conspiracy to deprive and the actual deprivation of the rights
of Larry Earvin, an inmate at the Western Illinois Correctional Center
(WICC), and during their participation in the forcible escort of Mr.
Earvin from his R1 (D Wing) residential housing unit at WICC to the
segregation housing unit at WICC on May 17 2018, Defendants
Sheffler, Hedden, and Banta assaulted Mr. Earvin without legal
justification in the segregation vestibule of WICC while he was
restrained and handcuffed behind his back and while he posed no
physical threat to the Defendants or other correctional officers.  Doc.
299, at 3.

The Government further states the evidence showed that the more senior officers, Defendant Sheffler, the lieutenant and senior officer to Defendants Hedden and Banta, and Defendant Hedden, the sergeant and senior officer to Defendant Banta, willfully failed to intervene to protect Mr. Earvin from being assaulted by subordinate officers, despite having the opportunity to do so.  Id. at 3-4.  The assault resulted in bodily injury to Mr. Earvin, including multiple broken ribs, a punctured mesentery, and other serious internal injuries, and further resulted in Mr. Earvin's death.  Id. at 4.

The Government further claims that both direct and circumstantial evidence established that upon his departure from the R1 housing unit at WICC and entry into the bullpen, Mr. Earvin had no visible injuries and was able to walk upright while being escorted by Defendants Hedden and Banta, Sergeant Volk, and Officer Hendricks.  Id.  Additionally, the Government presented witness testimony, including expert testimony from Dr. Collier and Dr. Norfleet, that Mr. Earvin was not suffering from the major internal injuries that eventually led to his death.  Id.  However, that changed after Sheffler ran from the area of the R4 housing unit to join the escort and relieve Sergeant Volk as the escort passed by the

3

Administration Building.  Id. at 4-5.  As shown in Government Exhibit 6, the only two officers that were seen thereafter on the video surveillance camera just outside of the WICC Operations and Segregation Buildings with hands directly on Mr. Earvin were Sheffler (on the left) and Banta (on the right), with Hedden leading the escort as it approached the Segregation Building.  Id. at 5.

The Government states the evidence showed that, as Mr. Earvin was being escorted into the segregation vestibule by Defendants Sheffler and Banta, with Defendant Hedden in front of them, Mr. Earvin was forcibly shoved toward the inner locked door, causing him to hit the base of the door and resulting in him lying on the floor on his left side with his right side exposed.  Id.  The force of Mr. Earvin hitting the door was loud enough to be heard by other correctional officers in the segregation unit.  Id.  Subsequently, Defendants Sheffler, Banta, and Hedden began assaulting Mr. Earvin by kicking and stomping him and by  Banta punching him.  Id.  Banta also jumped up in the air and landed on Mr. Earvin's torso with both knees.  Id.  Unlike the assault of Mr. Earvin in the R1 housing unit, the assault of Mr. Earvin in the segregation vestibule by Defendants Sheffler, Banta, and Hedden was so severe that it resulted in multiple

injuries to his head and body (causing external bleeding) and massive internal injuries, including broken ribs, a collapsed lung, internal bleeding (including a ruptured artery), a hematoma to the large intestine, a punctured mesentery, and a fractured sternum and shoulder.  Id. at 6.  The direct and circumstantial evidence presented at trial established that these injuries, which eventually resulted in Mr. Earvin's death, occurred in the segregation vestibule as he was being forcibly escorted into segregation by Defendants Sheffler, Banta, and Hedden.  Id.  Several witnesses (Defendant Hedden, Shawn Volk, Brett Hendricks, Matt Lindsey, Derek Hasten, and Blake Haubrich) testified at trial to witnessing the assault.  Id.  Three of those witnesses (Defendant Hedden, Hasten, and Haubrich) specifically testified that Sheffler participated in the assault of Mr. Earvin and failed to stop it.  Id.  Their testimony was corroborated by each other and by circumstantial and direct evidence, including the video surveillance recordings and the expert medical testimony.  Id.

Evidence Presented on Conspiracy to Engage in Misleading Conduct

The Government further states it presented significant evidence in support of the conspiracy to engage in misleading conduct charge.

Id. at 7.  Following the assault of Mr. Earvin, Defendants Sheffler, Hedden, and Banta conspired to engage in misleading conduct toward another person with the intent to hinder and prevent the communication to a federal law enforcement officer or judge of the United States of information relating to the possible commission of a federal offense, specifically, the offenses charged in Counts 1 and 2 of the Indictment.  Id.

As part of the conspiracy, each of the three Defendants filed false incident reports with WICC, falsely describing Mr. Earvin's escort and failing to disclose any assault or injuries to him.  Id. at 8. Defendants Hedden and Banta used identical false language, stating that Mr. Earvin was delivered to staff in the segregation unit "without further incident" other than Mr. Earvin resisting the escort and refusing to walk.  Id.  None of the incident reports identified any witnesses.  Id.

The Government states that, as further part of the conspiracy, Defendants Sheffler, Hedden, and Banta knowingly misled agents of the Illinois State Police (ISP) during individual interviews about the escort of Mr. Earvin by falsely denying any knowledge of the assault. Id.

The Government further claims that in Defendant Sheffler's Incident Report, he failed to disclose any information regarding the assault of Mr. Earvin and also failed to disclose any information about Mr. Earvin's injuries.  Id.  Sheffler did not disclose that Mr. Earvin was forcibly shoved into the inner door of the segregation vestibule.  Id.

Each of the three Defendants were interviewed by the Illinois State Police on the evening of May 18, 2018.  Id.  All three Defendants again falsely denied any knowledge of or participation in the assault of Mr. Earvin.  Id.

Defendant Hedden testified at trial that he and Defendant Banta communicated following Mr. Earvin's assault and agreed to conceal and provide false information to investigators about the assault.  Id. at 8-9.  They also discussed certain witnesses to the assault they were concerned might disclose accurate information to an investigation.  Id. at 9. Defendant Hedden testified he did not contact Defendant Sheffler because his perception of Sheffler was that it was not necessary.  Id.

The Government states that phone records were admitted at trial that corroborated Defendant Hedden's testimony and revealed

numerous contacts between the three Defendants and others.  <u>Id</u>. Defendant Sheffler's phone records indicated that during the evening of the assault, Sheffler called Banta and spoke for four minutes.  <u>Id</u>. Additionally, Sheffler's phone records indicate that the following evening, after his ISP interview had concluded but prior to the conclusion of Banta's interview, Sheffler attempted to call Banta.  <u>Id</u>. Banta's phone records indicate that after his ISP interview concluded later that same evening, Banta attempted to call Sheffler.  <u>Id</u>.  The following morning, on May 19, 2018, both Sheffler's and Banta's phone records reflect that Sheffler called Banta and spoke for nine minutes, after which Banta again called Hedden and Volk.  <u>Id</u>. at 9-10.

On February 26, 2019, nine months after the assault and during the grand jury investigation, FBI Special Agent McCarty interviewed Sheffler.  <u>Id</u>. at 10.  Sheffler again falsely denied any knowledge of or participation in any assault of Mr. Earvin and further falsely denied knowledge of any injuries to him.  <u>Id</u>.  At the interview, Sheffler was shown a copy of his Incident Report and asked if it needed to be updated, to which Sheffler said no.  <u>Id</u>.  Agent McCarty then served Sheffler with a grand jury subpoena.  <u>Id</u>.

<u>Defendant Sheffler's Statements pursuant to</u>
<u>Cooperation/Proffer Agreement with Government</u>

(1) March 4 and 5, 2019 Interviews

A few days later, on March 4 and 5, 2019, the Government interviewed Sheffler pursuant to a cooperation/proffer agreement requested by Sheffler and his attorney, William Vig.  <u>Id</u>.  The agreement provided that the Government extended consideration to Sheffler by providing him with conditional direct use immunity and agreeing to inform the Court of the nature of his cooperation and to consider a possible sentencing recommendation.  <u>Id</u>. at 10-11.  The terms of the cooperation agreement provided in part that: "[T]he government agrees that no statement made or information provided pursuant to this agreement may be used directly as evidence against your client in a criminal case, excepting . . . use as impeachment or rebuttal evidence should your client subsequently testify or take a factual position contrary to the information he provides."  <u>Id</u>. at 11 (citing Gov. Ex. 63).

The cooperation agreement further provided, "In return, your client agrees that he will provide complete and truthful information to and maintain contact, upon request, with law enforcement officials

regarding his criminal conduct and everything he knows or has reason to believe about the criminal conduct of others." Id.

The cooperation agreement also stated, "Should your client knowingly make any false statement or omission of any kind in providing information or testimony under this agreement, the government will be entitled to use his statements and evidence he provides, directly and indirectly, to institute and support a criminal prosecution for any offense as well as a prosecution for giving false statements and perjury." Id. at 12 (citing Gov. Ex. 63).

Additionally, the cooperation agreement stated that "your client must neither conceal or minimize his own actions or involvement in any offense, nor conceal, minimize, fabricate, or exaggerate anyone else's actions or involvement in any offense. He must be completely truthful about the facts, whatever those facts may be." Id. The agreement provided that any breach by Defendant Sheffler "will void this agreement in its entirety and will release the government from any obligation under this agreement." Id. The agreement was signed by Sheffler, his attorney, and the attorney for the Government. Doc. 299, at 12.

At the evidentiary hearing on the Government's motion, the Parties stipulated that Sheffler made the statements to agents that are at issue in the motion. Government Exhibit 63 is the 302, which is the form used by the FBI to memorialize an interview. Government Exhibit 3 consists of notes of the interview taken by one of the FBI agents present for the interview. The Parties stipulated that the notes summarize accurately statements to agents and the 302 and interview notes reflect differences in exact wording, which are self-evident when comparing the documents.

During the interviews on March 4 and 5, 2019, Sheffler, with counsel present, admitted he had been untruthful in his incident report and during the interview with ISP. Id. Sheffler stated that, through his peripheral vision, he saw Defendant Banta jump up in the air in the segregation vestibule and land on Mr. Earvin. Id. at 12-13. Sheffler further stated there was no way Banta did not land on Mr. Earvin. Id. at 13. Sheffler also stated that Banta engaged in excessive force against Mr. Earvin, and, further, Sheffler acknowledged that he should have reported Banta in Sheffler's Incident Report but did not do so. Id. Sheffler also admitted that he should have told the ISP in his interview that Banta had jumped on

Mr. Earvin but did not.  Id.  Sheffler further stated that it is common knowledge among WICC officers that there are no surveillance cameras covering portions of the segregation unit and that it is an institutional practice at WICC not to report when excessive force is used by its officers.  Id.

The Government claims that, while Sheffler admitted he was untruthful in his incident report and during the interview with ISP, he made numerous false, misleading, incomplete, and minimizing statements to the FBI and omitted entirely other statements he was obligated to provide under the proffer agreement.  Id.  The Government states that examples include:

(1) Sheffler's repeated denials of any involvement in the assault and repeatedly stating he did not lay a hand on Mr. Earvin;

(2) Sheffler failed to provide complete and truthful information concerning his knowledge of and participation in the assault of Mr. Earvin, having stated that the only thing he witnessed was Banta jumping up in the air and landing on Mr. Earvin;

(3) Sheffler stated that Mr. Earvin slid from his hold and seemed to jerk from his arm and that Sheffler let Mr. Earvin go to the ground; Sheffler denied seeing anyone push Mr. Earvin to the ground;

(4) Sheffler denied knowledge of any other officer involved in the escort of M. Earvin other than Banta; Sheffler denied knowledge of any injuries to Mr. Earvin before transferring custody of him to segregation staff; and

(5) Sheffler denied contacting Banta after Banta had contacted Sheffler through a Facebook message, and Sheffler also failed to disclose that he had called Banta on May 17 after the assault, attempted to contact Banta on May 18 following his ISP interview, and called Banta a second time on May 19 the morning after the ISP interview. Id. at 14-15.

(2) May 23, 2019 Pre- and Post-Polygraph Interviews

The Government states that several weeks after the March 4 and 5, 2019 interviews, the Government contacted Mr. Vig and advised that the investigation had revealed evidence of Sheffler's knowledge of and participation in the assault of Mr. Earvin and of Sheffler's violation of the terms of the proffer agreement. Id. at 15. Sheffler was given three options: (1) acknowledge the violation of the agreement and provide complete and truthful information to the Government as part of negotiating a plea resolution; (2) advise the Government that he no longer wished to cooperate; or (3) submit to

13

an FBI polygraph examination.  Id.  Sheffler's counsel advised the

Government that Sheffler chose to submit to the polygraph exam.  Id.

Before the polygraph exam with counsel present, in an audio

and video recorded interview, Mr. Vig advised Sheffler of the terms of

the proffer agreement, stating:

> So, the same parameters as always apply.  We're under a
> proffer agreement meaning that if we tell the truth on
> everything that the nothing we say can be used against us.
> On the flip side, uh, Mr. Smith is, of course, a federal agent,
> now, and if you lie to him and they can prove it not only can
> they invalidate the proffer, but they could also prosecute you for
> lying.

Id. at 15-16.

The Government states that, during the pre- and post-

polygraph interviews immediately following the admonition from

counsel, Sheffler again made false, incomplete, and minimizing

statements and omitted other statements he was required to provide

under the terms of the proffer agreement concerning his knowledge

of any participation in the assault of Mr. Earvin and his later

communications with Banta.  Id. at 16.  Moreover, Sheffler changed

his earlier statement concerning Banta by falsely stating that he did

not see Banta land on Mr. Earvin and he did not know if that

occurred but that it was "possible."  Id.  Sheffler stated it was also

possible that the incident involving Mr. Earvin was an "honest mistake." Doc. 321 at 5 (citing Gov. Exs. 1, 1A).

(3) Defendant Sheffler's Closing Argument

During the first trial, the Government repeatedly warned counsel for Sheffler and advised the Court that counsel was violating or likely violating the impeachment provisions of the proffer agreement. Id. at 17. The Government claims that, during her closing argument, after the Government's rebuttal case, counsel for Sheffler (Ms. Vig) violated the impeachment provision of the proffer agreement by making certain factual assertions, including the following:

> Todd worked the 7:00 to 3:00 shift that day. It's 9:00 before they're interviewing him. And he sits down. And he's honest. And he's kind. And he answers their questions. And they're not pulling teeth. Right? I will answer your questions. I will tell you all that I know.

Id. at 17-18. During a hearing outside the presence of the jury, the Court declined to allow the Government a remedy for counsel's alleged violation of the proffer agreement and stated that the trial would proceed. Id. at 20

In his Response, Defendant Sheffler claims nothing that occurred in the first trial supports granting the relief requested by

the Government and that taking a contrary factual position at trial is not a "violation" or "breach" of the proffer agreement.  Doc. 304 at 1-4.  To the extent that the Government relies on the Defendant's closing argument, Sheffler claims that closing arguments cannot trigger the impeachment/rebuttal exception.  Id. at 4-9.  Additionally, Sheffler alleges the Government is unable to show that Sheffler knowingly made a false statement or omission in his proffer to the Government.  Id. at 13.

## II. DISCUSSION

Applicable Law

A proffer agreement "is considered to be a contract" and "must be enforced according to its terms."  United States v. Reed, 272 F.3d 950, 954 (7th Cir. 2001).  The proffer agreement in Reed was identical to the proffer agreement of Sheffler in this case.  The defendant in Reed violated the immunity agreement when he told law enforcement he had no knowledge about and was not involved in the manufacture of drugs that was being investigated.  See id.  Because the agreement in Reed provided for nullification in the event of a breach, the government was free to use Reed's statements against him at trial

once the district court determined that the agreement had been violated. See id. at 955.

The Government has the burden of proving by a preponderance of the evidence that a defendant violated his proffer agreement. See United States v. Lopez, 222 F.3d 428, 434 (7th Cir. 2000) (noting that district court did not err in determining by a preponderance of the evidence that defendant violated proffer agreement); United States v. Ataya, 864 F.2d 1324, 1337-38 (7th Cir. 1988) ("In order for this Court to reverse the ruling of the district court that the government failed to prove a substantial breach of the plea agreement by a preponderance of the evidence . . . we must find the district court determination to be 'clearly erroneous,'" reversing the district court's decision that defendant did not breach the cooperation provision of plea agreement); United States v. Cobblah, 118 F.3d 549, 551 (7th Cir. 1997) ("Nor can we say that the district court erred in its determination that the government had established, by a preponderance of the evidence, that the defendant did know of Naveed's narcotics operation and therefore was less than truthful in his contrary assertion in the proffer statements.").

Under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6), "[s]tatements made during plea negotiations are inadmissible, but a defendant may waive the right to prevent their use." United States v. Krilich, 159 F.3d 1020, 1024 (7th Cir. 1998). A defendant waives his rights under Rule 410 and Rule 11(e)(6) when he signs a proffer letter. Id. at 1024-26; United States v. Dortch, 5 F.3d 1056, 1068 (7th Cir. 1993).

"A proffer, of course, is a defendant's (or someone who is hoping not to become a defendant) controlled statement to government agents made to facilitate plea agreements or discussions." United States v. Richardson, 130 F.3d 765, 778 (7th Cir. 1997), vacated on other grounds, 526 U.S. 813 (1999). A proffer agreement is a contract which "must be enforced according to its terms." See Reed, 272 F.3d at 954. A conditional waiver is given "neither a stingy reading nor a generous one but a natural reading, which leaves the parties in control through their choice of language." Krilich, 159 F.3d at 1025.

An individual may breach a proffer agreement if he is required to be "completely truthful about the facts" and fails to disclose his involvement in the offense. See Reed, 272 F.3d at 954. A defendant can also breach a proffer agreement by, either directly or through his

attorney, taking a factual position—via testimony, cross-examination of witnesses, or arguments of counsel alone—that is contrary to the statements he made under the proffer agreement.  See Krilich, 159 F.3d at 1025 ("One can 'otherwise present' a position through arguments of counsel alone, so it is easy to see how a position can be 'presented' by evidence developed on cross-examination and elaborated by counsel.")

If the Court determines that a defendant breaches a proffer agreement in either manner, the government is free to use the statements against defendant at trial.  See Reed, 272 F.3d at 955; Krilich, 159 F.3d at 1024-26.  The defendant in Reed entered into a proffer agreement in the Central District of Illinois which was identical to Defendant Sheffler's proffer agreement.  272 F.3d at 954. Upon affirming the Court's finding that Reed breached his proffer agreement with the government and allowing the government to introduce his statements at trial, the Seventh Circuit found that Reed was not completely truthful, minimized his own conduct, and minimized the conduct of another suspect.  See id.  The Seventh Circuit observed:

Moreover, after being repeatedly notified that Reed's lies were being considered by the government to be a material breach of the agreement, neither Reed nor his attorney made any attempt to rectify the situation and disclose the complete truth before trial. Reed's falsehoods and the absence of an effort to remedy them, indeed, his display of utter apathy in cooperating with the government at all, constituted an unambiguous violation of his agreement. The violation rendered the agreement null and void as per paragraph 11 and destroyed any use immunity that Reed otherwise might have enjoyed vis à vis the statements that inculpated him. . . .

Reed's violation thus denied the government the very benefit that the agreement was intended to secure-information that would aid in the identification and prosecution of other methamphetamine traffickers. Reed's agreement, intended to be representative of a symbiotic relationship between a defendant and the government, had been reduced to a useless piece of paper that served only one of its parties.

Id. at 954-55. Because Reed was found to have violated the agreement, "the government was free to use Reed's statements against him at trial." Id. at 955.

Defendant Sheffler's Violation of Proffer Agreement

Upon reviewing the record, the Court finds that the Government has established by a preponderance of the evidence that Defendant Sheffler has breached the proffer agreement and the Government is entitled to introduce Sheffler's post-proffer statements at trial in the Government's case-in-chief. Based on the evidence presented at trial, it is clear that during the March 4 and 5, 2019 interviews with

law enforcement, Sheffler failed to provide complete and truthful information concerning his knowledge of and participation in the assault of Mr. Earvin.  Sheffler stated that the only thing he witnessed was, through his peripheral vision, Defendant Banta jumping up in the air and landing on Mr. Earvin.  Later, during the pre- and post-polygraph interviews, Sheffler changed his earlier statement concerning Banta's role by stating that he did not see Banta land on Mr. Earvin and that he did not know if that occurred but it was "possible."  Sheffler also stated it was "possible" that the incident involving Mr. Earvin was an "honest mistake."  Obviously, both of those statements regarding Banta's role cannot be true.  The Government proved beyond a reasonable doubt that Banta was guilty of each charge.

Several witnesses (Defendant Hedden, Shawn Volk, Brett Hendricks, Matt Lindsey, Derek Hasten, and Blake Haubrich) testified at trial to witnessing the assault and three of those witnesses (Defendant Hedden, Hasten and Haubrich) testified that Sheffler participated in the assault of Mr. Earvin and failed to intervene to stop it.  It is true, as Sheffler alleges, that these witnesses may have wanted the Government to be satisfied with their proffer statements

to the extent that it would not be interested in prosecuting them for any involvement or, in the case of Defendant Hedden, that the Government would be willing to recommend a reduced sentence based on substantial cooperation.  Additionally, Sheffler notes that he presented evidence that Mr. Earvin was beaten in R-1.  However, the testimony of the witnesses cited by the Government was corroborated by each other and by other circumstantial and direct evidence, including the video surveillance recordings and the expert medical testimony.

The Court concludes, therefore, that the Government has established by a preponderance of the evidence that Sheffler failed to provide complete and truthful information concerning his knowledge of and participation in the assault of Mr. Earvin.  Sheffler was clearly aware that the assault involved more than Defendant Banta jumping up in the air and landing on Mr. Earvin.  Additionally, given the extent of Mr. Earvin's injuries, Sheffler knew on May 23, 2019, that the incident involving Earvin could not possibly have been an "honest mistake."

The Government has also established by a preponderance of the evidence that Sheffler falsely denied knowledge of any injuries to Mr.

Earvin before transferring custody of him to segregation staff.  While Sheffler reported a memory of seeing a mark on Mr. Earvin's forehead, given the extent of Mr. Earvin's injuries, it simply is not possible that Sheffler was unaware that Earvin was injured to some extent.  This is true even if, as Sheffler claims, Mr. Earvin seemed to be exhausted and had difficulty walking and Sheffler and Banta were bearing most of Mr. Earvin's weight during the escort.  Based on other evidence, including the pictures of Mr. Earvin following the assault and the testimony of Dr. Collier and Dr. Norfleet, the Court concludes that the Government has established that Sheffler falsely denied knowledge of any injuries to Mr. Earvin before transferring custody of him to segregation staff.

The record also establishes that Sheffler falsely denied contacting Defendant Banta after Banta had contacted Sheffler through a Facebook message, and he further failed to disclose that Sheffler had called Banta on May 17 after the assault, attempted to contact Banta on May 18 following the ISP interview, and called Banta a second time on May 19, the morning after the ISP interview. Sheffler claims that he simply did not remember telephone contact with Banta and that does not equate to dishonesty.  Moreover, the

fact that he shared messages received from Banta with the Government suggests that Sheffler was not being dishonest. The Court disagrees. While it might be difficult to remember the exact number of phone calls one year later, it simply is not believable that Sheffler called Banta on three occasions—the evening of the assault, the next night after the ISP interview, and then again the following morning—and Sheffler did not remember any of the calls. Special Agent Bray testified that the content of these calls was important to the Government. By not even acknowledging the calls, Sheffler violated the proffer agreement. Accordingly, the Government has established by a preponderance of the evidence that Sheffler falsely denied making the phone calls to Banta following the assault.

Based on the foregoing, the Court finds by a preponderance of the evidence that Sheffler made multiple false, misleading, incomplete, and minimizing statements to the FBI and omitted other statements he was required to provide under the proffer agreement. Moreover, Sheffler never made an attempt to rectify the situation and disclose the entire truth prior to trial.

At the evidentiary hearing, Special Agent Bray testified that when an individual provides false, incomplete, and minimizing

statements under a proffer agreement, that individual is of no value as a cooperating witness and materially hinders the grand jury investigation. The result of Sheffler's "violation thus denied the government the very benefit that the agreement was intended to secure—information that would aid in the identification and prosecution of other" individuals involved in the deprivation of Mr. Earvin's civil rights. See Reed, 272 F.3d at 955. The result is that Sheffler's agreement, "intended to be representative of a symbiotic relationship between and defendant and the government, had been reduced to a useless piece of paper that served only one of its parties." Id. Because the proffer agreement provided for its nullification in the event of a breach, and the Court finds that Sheffler violated the agreement, the Government is entitled to introduce Sheffler's proffer statements at trial.

Therefore, the Government's Motion to Revoke Defendant Sheffler's Proffer Agreement and to Allow Admission of Post-Proffer Statements in the Government's Case-In-Chief at Trial [d/e 299] is GRANTED.

The Government is permitted to introduce Defendant Sheffler's Post-Proffer Statements in the Government's case-in-chief at trial.

ENTER: June 23, 2022

/s/ *Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE